Paul SCHOENFELD, Plaintiff-Appellant,

v.

Bruce BABBITT, In his official capacity as Secretary of Interior for the United of America, Defendant-Appellee.

No. 98-8071.

United States Court of Appeals,

Eleventh Circuit.

March 4, 1999.

Appeal from the United States District Court for the Southern District of Georgia. (No. CV296-166), Anthony A. Alaimo, Judge.

Before COX, CARNES and HULL, Circuit Judges.

COX, Circuit Judge:

Plaintiff-Appellant Paul Schoenfeld sued Bruce Babbitt in his official capacity as Secretary of the Department of Interior alleging that the Department had discriminated against him on the basis of his race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* He appeals from a district court order entering summary judgment against him. We affirm in part and reverse in part.

I. Background Facts[1]

In the fall of 1994, the United States Department of Interior, Fish and Wildlife Service advertised an opening for a fish and wildlife biologist in Brunswick, Georgia. The usual hiring procedure for a Fish and Wildlife Service GS-11 position is as follows. When a decision is made to create a new position or hire someone into a vacant position, a notice is posted which advertises the opening and provides a limited period of time for interested parties to submit applications. After the period for receiving applications expires, a personnel specialist in the Personnel Office in Atlanta, Georgia, ranks the applicants and places the names of the eligible people on a "merit staffing certificate." This certificate is then sent to the initial-selecting

---

[1]We draw the following factual account from the record below. We note where there are disputes, but we resolve them by crediting the evidence submitted by Schoenfeld, the non-moving party. *See Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996).

official for the position. The certificate remains effective for 60 days. Although one 30-day extension is possible, if no candidate is hired by the time it expires, then the process must begin again.

The initial-selecting official reviews the applications of the people listed on the merit staffing certificate and may schedule interviews if he believes they would be helpful. The official then selects whoever he believes is the most qualified candidate and attaches to the certificate a form indicating the selection. In addition, the official completes an "outreach recruitment plan and techniques" form and a "women and minorities recruitment checklist." The outreach plan form is several pages long and contains questions that are aimed at determining whether full consideration has been given to minority applicants.[2] The checklist is a one-page form that contains nine different statements regarding actions that could be taken to attract minority and female candidates to the advertised position. Each statement has a blank space next to it that can be filled with a check to indicate that the action has been taken.[3]

The initial-selecting official then sends his recommendation and the requisite forms to the assistant regional director of his program. If that person agrees with the selection, he or she forwards it to the Office of Human Resources, where it is reviewed and screened for compliance with Equal Employment Opportunity (EEO) guidelines. After Human Resources reviews the recommended candidate package and indicates approval or disapproval, the package of materials is sent to the regional director in Atlanta, Georgia, for a final decision. If the regional director approves the selection, then the information is sent back to Personnel. Personnel then calls the selected person and offers him or her the job.

---

[2]Questions on the form include: (1) "Has the feasibility of recruiting at multiple grade levels been considered in order to attract a wider applicant pool ...?"; (2) "Have potential advertising sources (professional/minority/ethnic publications, Federal Job Opportunity List, Federal Career Opportunities, local newspapers) been considered for optimal recruiting effort?"; (3) "Has the position vacancy been discussed with Service contacts and external counterparts (e.g. other personnel offices, equal employment offices, etc.)?"; and (4) "Have efforts been made to ensure that subject matter experts or rating panel members are selected from culturally diverse groups whenever possible?" (R. 2-52 at 13F.)

[3]For example, the Checklist contains such possible actions as "[r]estructured position to lower grade level to insure more women and minorities had an opportunity to qualify for the position" and "[s]ent copies of vacancy announcements to women and minority organizations." (R. 2-52 at Ex. 13F).

In this case, a notice was posted in the fall of 1994 that advertised a GS-9/11 fish and wildlife biologist position with the Fish and Wildlife Service in Brunswick, Georgia. The notice asked potential candidates to fill out a standard SF-171 form and separately address five different Knowledge, Skills, and Abilities (KSAs) ranking factors. Paul M. Schoenfeld, a white male, applied for the position. After the application period expired, Michael White, a personnel specialist, prepared a merit staffing certificate for the position on October 11, 1994. The certificate contained the names of Schoenfeld, another male, and three females. Donna McElwee, a Program Analyst in Atlanta, Georgia, then sent the certificate to Philip Laumeyer, the initial-selecting official. She also sent him the applications, the women and minorities recruitment checklist, and the outreach plan form. The certificate stated that it was valid "through the close of business December 12, 1994." (R. 2-52 at Ex. 13F.)

At the time, Laumeyer was the field supervisor for the Ecological Services field office in Brunswick, Georgia. Upon receiving the materials, Laumeyer decided that interviews would not aid in the selection. He covered the names of the applicants and conducted a race and gender blind rating of them based on their experience and their responses to the requested KSAs. Using this process, he ranked Schoenfeld as the most qualified applicant. He filled out the appropriate forms on November 23, 1994, and sent Schoenfeld's name and the package of materials back to McElwee.

McElwee forwarded the materials to Nancy Coon, Laumeyer's immediate supervisor and the deputy assistant regional director for Ecological Services in Atlanta, Georgia. Coon reviewed the recommendation and on December 5, 1994, concurred in the selection of Schoenfeld for the position. She then sent the recommendation and materials back to McElwee. After receiving the materials, McElwee walked them over to the Human Resources Office where she gave them to either Bennie Boyd or his assistant. Boyd was the assistant regional director for Human Resources for the southeast region of the United States Fish and Wildlife Service. He reviewed the recommendation and the attached materials.

3

At this point, the factual accounts offered by the parties differ. According to Laumeyer, he was contacted by either Boyd or Coon and told that his outreach plan needed to be "fleshed out" because, as initially completed, it only had a terse "yes" or "no" written in pencil beside each question. (R. 2-40 at 18-19, 23.) After receiving this message, Laumeyer claims that he filled out a new outreach plan with more detailed responses and sent it through the appropriate channels back to his supervisor and Human Resources. (*Id.* at 20.) Shortly thereafter, however, he received a phone call from Boyd. Boyd told him that he needed to more fully justify his selection of Schoenfeld. (*Id.* at 24.) Laumeyer could not determine what exactly Boyd meant for him to do in order to more fully justify his selection. Although he asked Boyd what needed to be more fully justified, he never received a clear answer. During the course of this phone conversation, Boyd suggested Laumeyer consider a specific female candidate on the merit staffing certificate named Ms. Chubb. (*Id.* at 25-26.) According to Laumeyer, it was "strongly implied" that he should hire her for the position, and he responded that, in his opinion, Ms. Chubb was not as qualified as Schoenfeld. (*Id.* at 25-26, 60.) Laumeyer had never before been asked to provide this much justification for one of his selections. (*Id.* at 36-37.)

According to Boyd, he reviewed the materials and called Laumeyer to discuss his selection. He told Laumeyer that Laumeyer's justification for hiring Schoenfeld over the other candidates on the certificate was "weak." (R. 2-36 at 14-15.) Boyd also told him that he had not attached an outreach plan to the recommendation. (*Id.*) As a result, Boyd told him to fill out an outreach plan and provide further justification for his hiring decision. (*Id.*) Boyd maintains that he never indicated to Laumeyer that he should consider any particular candidate for the position. (*Id.*) He claims that he discussed the qualifications of Schoenfeld and that he told Laumeyer to put his justification in writing, and he would approve it. He admits, however, that he requested additional justification in part because Laumeyer had selected a white male and there were females on the Certificate. (*Id.* at 28.)

4

McElwee was informed by either Boyd or Coon that there was a problem with Laumeyer's selection in that Boyd wanted the candidates to be reviewed again because there were women and minorities on the certificate that he wanted to make sure were properly considered. (R. 2-46 at 13-14.) She received the application package back from Boyd. Attached to it was a memorandum addressed to Coon. McElwee returned the package to Coon. The memorandum, dated December 14, 1994, explained that:

> I spoke directly to Philp [sic] Laumeyer, on failure to implement EEO initiatives, and weak justification offered on this selection. He stated that he strongly supports affirmative employment, and of 12 staff biologists at his station, 6 are female. He further stated that while Ms. Chubb was basically qualified, she would require extensive training because her experience reflect [sic] minimal skills that are presently in abundance at that station. He also said that the selectee provided different experience and skill required of this position. I suggest that these comments be included in the justification and that the Director's recruitment plan questionnaire completed.

(R. 2-52 at Ex. 13G.)

Coon forwarded this memorandum to Laumeyer with the added statement "[p]lease address HR's concerns. Return to Donna. Direct your comments to Dr. Butler who will decide whether to approve your selection. Our experience has been that current composition of an individual office does not carry the day."[4] (*Id.*) After receiving this memorandum, Laumeyer wrote his comments in the margins. Next to the statement suggesting that he had not fully implemented the EEO initiatives, he wrote "[t]his is not true. They were implemented and justified." (*Id.*) Next to the comment that Ms. Chubb was "basically" qualified he wrote "marginally." Finally, next to the reference to him being told to complete the Director's recruitment plan questionnaire, he wrote "[t]his was completed (twice%5A)." (*Id.*)

On December 20, 1994, Laumeyer sent a memorandum entitled "Further Justification for Selecting Mr. Schoenfeld" to McElwee so that it could be forwarded to the regional director. (R. 2-52 at Ex. 13H). His additional justification explained how he had selected Schoenfeld using a blind rating system and that Schoenfeld had demonstrated superior performance in his responses to each of the KSAs. He noted that Ms.

---

[4]Dr. Jerome Butler was the acting regional director for Ecological Services. Under the applicable hiring scheme, he had final hiring authority for the biologist position in this case.

5

Chubb had been rated third on his initial selection sheet, and that she had not responded to the KSAs. He also stated that Schoenfeld's SF-171 indicated a "self-motivated individual" who would bring land management knowledge to the office which would not be a duplication of existing office abilities.

In a note to McElwee on the routing form, he wrote "Donna, I don't know what else to write. Schoenfeld is head and shoulders better than the other applicants. If I can't get him, maybe we should extinguish the position. As you can see by Boyd's memo—he is absolutely no help." (*Id.*) Laumeyer does not know what happened to his recommendation and his package of materials after it was sent back to Atlanta on December 20, 1994. McElwee claims that she took the material from Laumeyer and brought it to Coon. (R. 2-46 at 19.)

Tom Olds was the assistant regional director of Ecological Resources through February 1995. In that position, he was Nancy Coon's supervisor, although Coon did have acting authority in certain areas. On December 30, 1994, Olds placed his surname on the same sheet that Coon had signed on December 5 to indicate her approval of Laumeyer's recommendation. Since it had Coon's name on it already and she was supervisor of the Brunswick station, his approval of the selection was not necessary. He placed his surname on it, however, in order to process the paperwork. (R. 2-44 at 23-24.) Olds states that after he placed his surname on the package, it should have been picked up and sent back to Human Resources. (*Id.*) McElwee testified that she typically would have taken the packet from Olds and delivered it to Human Resources, but in this case she could not specifically recall delivering these documents. (R. 2-46 at 21.)

Coon retired in early January 1995 around the same time that Olds found the packet on his desk, and Gerald Purdue became the acting Deputy Assistant Regional Director of Ecological Services on January 8, 1995. The parties dispute the role of Pardue in this case. According to Schoenfeld, Pardue had no role in the selection process because after Coon signed the certificate, nothing else had to be done with the application in the Ecological Services offices. (R. 2-44 at 25.) At that point, the packet should have been routed back to Human Resources and Boyd. According to Schoenfeld, Pardue did not have time to take any action on the

6

certificate until after it expired because he did not start work until three days before the last possible date that the certificate could have expired.

In contrast, Boyd claims that he never saw the packet of materials again and that it did not come back through his office. (R. 2-36 at 23.) Pardue claims that the certificate and packet of materials was on his desk when he started working. (R. 2-35 at 11-12.) Pardue noticed that he had a short period of time in which to act on it and he made some calls to Personnel to inquire about it. (R.2-35 at 17-19.) Through either these calls or talking to Schoenfeld himself, he learned that Laumeyer had told Schoenfeld that he had been selected for the position even though no final decision had been made. (R. 2-35 at 18-19.) Since this was a breach of protocol, he claims that he let the certificate expire without anyone being selected. (R. 2-35 at 35.)

In late November or early December 1994, Schoenfeld was notified that he had been selected for the position by some employees in the Fish and Wildlife Service who congratulated him on his selection. (R. 2-55 at 53-58.) When he did not hear anything for a few weeks, he called Laumeyer. Laumeyer told him that he had been selected, but the application had been held up for equal employment opportunity reasons because the Human Resources Office wanted increased justification for the selection and were pressuring him to hire a specific female for the position. (R. 2-55 at 58, 63-64.) Schoenfeld called Laumeyer again in early January 1995, and he was told that his selection was not looking good. (R. 2-55 at 65-66.)

On January 12, 1995, Schoenfeld filed an administrative grievance with the EEO contending that the Fish & Wildlife Service had discriminated against him on the basis of his sex and race when it had refused to hire him for the biologist position. Schoenfeld received a letter on January 18, 1995, from the Department of the Interior's Personnel Office informing him that he had not been hired for the position and that the certificate had expired without anyone being hired.

## II. Procedural Background

Schoenfeld filed this action in the United States District Court for the Southern District of Georgia. The three-count complaint named as defendants Bruce Babbitt, in his official capacity as Secretary of the

7

United States Department of Interior and Bennie Boyd.  It alleged that the Department had discriminated against Schoenfeld on the basis of his sex and race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* and that Boyd had personally discriminated against him in violation of the Equal Protection clause of the Fifth Amendment of the United States Constitution.  The complaint sought compensatory damages, back pay, placement in a comparable position, and attorney's fees.

The equal protection claims against Boyd were voluntarily dismissed without prejudice.  Babbit then moved for summary judgment on all the claims against him.  The district court granted the motion.  The district court first analyzed Laumeyer's statement that Boyd had refused to concur in the selection of Schoenfeld because he was a white male and concluded that the statement was not direct evidence of discrimination.  The court then found that Schoenfeld had failed to make out a prima facie case of sex or race discrimination using circumstantial evidence because:  (1) he had not demonstrated that he had been treated differently than any other applicant, since no one had been hired for the position;  and (2) there was insufficient other evidence of discrimination in the record to create a question of fact on the issue.  In this appeal, Schoenfeld challenges the district court's conclusions that there was neither direct nor circumstantial evidence of discrimination.

### III. Standard of Review

We review *de novo* a district court order granting a motion for summary judgment.  *Raney v. Vinson Guard Service, Inc.,* 120 F.3d 1192, 1196 (11th Cir.1997).  The entry of summary judgment is only appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  In examining the record, we view the evidence in the light most favorable to the non-moving party.  *See Arrington v. Cobb County,* 139 F.3d 865, 871 (11th Cir.1998).

### IV. Discussion

1.      *Jurisdiction*

8

As a preliminary matter, we conduct a *sua sponte* inquiry into our jurisdiction to hear this appeal. Absent the application of some exception, this court only has appellate jurisdiction to hear appeals from "final decisions" rendered by district courts. 28 U.S.C. § 1291. When there is more than one claim for relief or there are multiple parties in an action, a district court order is a "final decision" if it either: (1) adjudicates all the claims against all the parties in the action; or (2) explicitly states that "there is no just reason for delay" and expressly directs the entry of final judgment as to one or more of the parties but not all of them. Fed.R.Civ.P. 54(b); *Jetco Electronic Industries, Inc. v. Gardiner,* 473 F.2d 1228, 1231 (5th Cir.1973). In addition, there is an exception to the finality rule pursuant to which a party may appeal from an otherwise nonfinal district court order in a multiparty case if a series of orders, taken together, effectively terminate the litigation between all the parties. *See Jetco,* 473 F.2d at 1231.[5]

As originally filed, this case was a multiparty action brought against both Babbitt and Boyd. In response to a motion to dismiss filed by Boyd, Schoenfeld filed a stipulation under Fed.R.Civ.P. 41 that dismissed without prejudice the claim against Boyd. The district court then issued the order granting summary judgment and directing that final judgment be entered for Babbitt and against Schoenfeld. The issue before us is whether the rule articulated in *Ryan v. Occidental Petroleum Corporation,* 577 F.2d 298 (5th Cir.1978), and its progeny dictates that we dismiss this case for lack of jurisdiction due to Schoenfeld's dismissal without prejudice of the claim against Boyd.

In *Ryan,* the former Fifth Circuit held that it lacked jurisdiction to hear an appeal from a district court order dismissing some of the plaintiff's claims with prejudice since the plaintiff had also entered a voluntary dismissal without prejudice of the remaining claims. *Ryan,* 577 F.2d at 302. The court in *Ryan* reasoned that the initial district court order was not a final decision because at the time it was issued, there were still claims remaining, and it did not contain the district court certification required by Rule 54(b). *Id.* at 301-303. The

_____

[5]There are other exceptions to the final judgment rule. They are not relevant here, however, and we do not discuss them.

court held that the "successive order" exception articulated in *Jetco* did not apply because the subsequent voluntary dismissal did not terminate the litigation between the parties so as to convert the earlier order into an appealable final decision. *Id.* at 302. The court stated that the litigation had not been effectively terminated at the district court level because the dismissal was without prejudice to the plaintiff refiling the claims at a later time. *Id.*

This circuit has since invoked *Ryan* in similar situations to conclude that it lacked jurisdiction to hear appeals from nonfinal orders. *See Construction Aggregates, Ltd. v. Forest Commodities Corp.,* 147 F.3d 1334 (11th Cir.1998) (per curiam) (no jurisdiction to review an order granting summary judgment against a party in light of fact that party later voluntarily dismissed its counterclaim without prejudice); *Mesa v. United States,* 61 F.3d 20 (11th Cir.1995) (no jurisdiction to review a district court's order dismissing some claims where plaintiff later voluntary dismissed remaining claims without prejudice). The common element in *Ryan, Construction Aggregates,* and *Mesa* was that the plaintiff in each case filed a voluntary dismissal without prejudice after the district court entered an adverse, non-final order that did not dispose of the entire case or contain the district court's requisite Rule 54(b) certification. One possible purpose of the plaintiff's voluntary dismissal was to end all proceedings in the district court so that the plaintiff could pursue an immediate appeal of the earlier order. *See Ryan,* 577 F.2d at 300. As a result, the issue presented was whether a stipulation of voluntary dismissal without prejudice of the remaining claims in a case could confer finality on an earlier nonfinal district court order that lacked Rule 54(b) certification. *See Mesa,* 61 F.3d at 22.

In this case, Schoenfeld dismissed the claim against Boyd without prejudice before the district court entered the order granting summary judgment and entered a final judgment. Consequently, the district court order granting summary judgment adjudicated all the claims against all the remaining parties in the action at the time it was entered. There was simply no reason for the district court to even consider including the

alternative certification required by Rule 54(b). This situation is, therefore, distinct from the one covered by *Ryan, Construction Aggregates,* and *Mesa.*

Although the language in *Ryan* and its progeny could be read to have a broad application, we conclude that it was not meant to apply to the present case. Instead, we read *Ryan* and its progeny to apply only when a plaintiff voluntarily dismisses its remaining claims without prejudice after a nonfinal adverse district court order has been entered. In such a situation, the district court would have had the discretion to certify under Rule 54(b) its earlier adverse order for immediate appeal. *See Ryan,* 577 F.2d at 302-303. If the district court chooses not to do so, then there is a presumption that the plaintiff's voluntary dismissal was an improper attempt to manufacture jurisdiction for an immediate appeal. *See id.*[6]

Since there was a "final decision" in this case, we conclude that we have jurisdiction under 28 U.S.C. § 1291 to hear this appeal.

2.      *Summary Judgment*

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff in a Title VII action may attempt to show this discrimination by offering either direct or circumstantial evidence. *Hill v. Metropolitan Atlanta Rapid Transit Auth.,* 841 F.2d 1533, 1539 (11th Cir.1988), *modified,* 848 F.2d 1522 (11th Cir.1988). Schoenfeld seeks to show discrimination using both methods.

A.      *Direct Evidence*

Direct evidence of discrimination is evidence, that, "if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Burrell v. Board of Trustees of Ga. Military College,* 125 F.3d

---

[6]By restricting the application of *Ryan* and its progeny, we remove the danger discussed by the concurrence in *State Treasurer of Michigan v. Barry,* --- F.3d ---- (11th Cir.1999), that under *Ryan* parties could "strategically" voluntarily dismiss a trivial claim early in a case in order to prevent appellate review of the district court's later disposition of the primary claims.

11

1390, 1393 (11th Cir.1997) (citations omitted). As our precedent illustrates, direct evidence is composed of "only the most blatant remarks, whose intent could be nothing other than to discriminate" on the basis of some impermissible factor. *Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir.1989); *see, e.g., Caban-Wheeler v. Elsea,* 904 F.2d 1549 (11th Cir.1990) (in Title VII race discrimination case brought by a white woman who was terminated from her program director position, statement by decision-maker that the program needed a black director was direct evidence of discrimination). If an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence. *Burrell,* 125 F.3d at 1393.

In this case, the district court explicitly considered only one statement in its discussion of whether there was direct evidence of discrimination. Schoenfeld argues that the court erred in not finding that statement and several other statements to be direct evidence. The statement considered by the district court was Laumeyer's assertion that he believed Schoenfeld had not been hired due to his race and gender. There were three other statements that Schoenfeld contends he presented to the district court that the district court did not explicitly discuss. First, McElwee, the program analyst who brought the recommendation file to Boyd, testified that she was told by either Boyd or Coon that Boyd wanted the women or minorities on the certificate to be reviewed again. (R. 2-46 at 13-14.) Second, Judith Turk, an EEO counselor who worked for Human Resources, testified that Boyd told her that he had informed Laumeyer that he had to provide a legitimate justification for why he was selecting Schoenfeld for the position when there were female candidates on the certificate. (R. 2-52 at 2; R. 2-39 at 71.) Finally, Boyd was asked during his deposition "[t]he reason that you requested additional justification on this particular staffing certificate, was it because Mr. Laumeyer had selected a white male in this position?" and he responded "[i]t was more than that" and stated that the justification was also poor, the outreach statement was missing, and there were three women on the certificate. (R. 2-36 at 28.)

Although these statements suggest discrimination, they are not the type of "blatant remarks" from which discrimination can be found without the aid of an inference. If the statements are accepted as true, a

12

rational jury could infer from them that Boyd was discriminating against Schoenfeld because he was a white male. At the same time, however, a rational jury could also infer that Boyd was merely fulfilling his job responsibility to ensure that EEO Guidelines were properly followed and that all minority applicants were fairly considered. Given the differing inferences that may be drawn from these statements, we conclude that the district court did not err in ruling that Schoenfeld had not presented any direct evidence of discrimination.

B.    *Circumstantial Evidence*

When a plaintiff attempts to prove intentional discrimination in violation of Title VII using circumstantial evidence, we apply the now familiar shifting burden framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Eskra v. Provident Life and Acc. Ins. Co.,* 125 F.3d 1406, 1411 (11th Cir.1997). If he meets that burden, then an inference arises that the challenged action was motivated by a discriminatory intent. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Jones v. Gerwens,* 874 F.2d 1534, 1538 (11th Cir.1989). The burden then shifts to the employer to "articulate" a legitimate, non-discriminatory reason for its action. *Burdine,* 450 U.S. at 254-55, 101 S.Ct. at 1094-95. If the employer successfully articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is really pretext for unlawful discrimination. *Id.* at 255-56, 101 S.Ct. at 1095-96.

1.    *Prima Facie Case*

In a traditional failure-to-hire case, the plaintiff establishes a prima facie case by showing that: (1) he was a member of a protected class; (2) he applied and was qualified for a position for which the defendant was accepting applications; (3) despite his qualifications, he was not hired; and (4) after his rejection the position remained open or was filled by a person outside his protected class. *Welborn v. Reynolds Metals Co.,* 810 F.2d 1026, 1028 (11th Cir.1987) (per curiam).

13

Schoenfeld's complaint alleges that he was discriminated against both on the basis of his race and on the basis of his gender. The Government concedes that Schoenfeld made the first three requisite showings in his discrimination claims in that he was a white male who applied for the biologist position and was qualified for it but was not hired. The key inquiry, therefore, is whether he has met the fourth requirement. The district court concluded that Schoenfeld had not because he had not shown that anyone had been hired for the biologist position, he had not shown that he had been treated differently than any similarly situated female or minority applicant, and he had not offered any other evidence of discrimination.

The district court correctly disposed of the race discrimination claim because it is clear that Schoenfeld has failed to satisfy the fourth prong of the requisite prima facie showing. Although he makes conclusory references to Boyd suggesting that Laumeyer hire an Oriental woman, he points to no admissible evidence indicating the race of the woman. Instead, there is only speculation that the female might have been Oriental. (R.2-40 at 36; R. 2-55 at 83-84, 106; R. 2-52 at Ex. 131.) As a result, there is no showing that Schoenfeld was treated differently than a minority applicant and he has failed to raise an inference that race was a factor in his non-selection.

The gender discrimination claim, however, presents a closer question. We have repeatedly emphasized that the requisite showings that make up a prima facie case are not meant to be rigid or inflexible. *See Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1525 (11th Cir.1991); *Jones,* 874 F.2d at 1538; *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 594 (11th Cir.1987). In cases where the evidence does not fit neatly into the classic prima facie case formula, for example, we have stated that "[a] prima facie case of disparate treatment can be established by any 'proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.' " *Hill,* 841 F.2d at 1540 (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)).

14

We believe that Schoenfeld's gender discrimination claim presents such a situation. Schoenfeld has presented evidence that Boyd failed to concur in his selection because he was a male and then suggested that a specific female applicant be considered for the position instead of him. In his deposition, for example, Boyd responded that "[i]t was more than that" when asked if he had requested additional justification because a white male had been selected for the position. (R. 2-36 at 28.) This statement can be construed as a tacit admission that gender was a factor in Schoenfeld's rejection. Turk, a Human Resources employee, also indicated that Boyd had requested that Laumeyer provide additional justification because a male had been selected for the position. (R. 2-52 at 2; R. 2-39 at 71.) Furthermore, there is the testimony of McElwee that historically Boyd had only requested additional justification from the initial selecting officers when white males were selected for positions. (R. 2-46 at 24-25.) Finally, there is Laumeyer's testimony that Boyd asked him to further consider a specific female applicant instead of Schoenfeld. (R. 2-40 at 25-26.) Laumeyer stated that he felt pressured by Boyd to hire the female applicant, and he believed that if he had selected her then the recommendation would have been approved without delay. (R. 2-40 at 46-48, 60.)

Although Boyd was not the final decision maker, he was an integral part of the multi-level hiring process that had been established by the Department of Interior's Fish and Wildlife Service. It was necessary for him to indicate his approval or disapproval of a candidate and forward the application packet before it would reach the final decision maker. As a result, the evidence regarding Boyd's conduct suggests that a discriminatory animus was at work that tainted the entire hiring process.

This evidence, when considered together, creates a situation that is analogous to an employer deciding not to hire a particular candidate and then continuing to consider other applicants for the position who are members of a different race or gender. *See, e.g., Furnco Constr. Corp.,* 438 U.S. at 576, 98 S.Ct. at 2949; *Hill v. Metropolitan Atlanta Rapid Transit Auth.,* 841 F.2d 1533, 1540 (11th Cir.1988); *cf. Diaz v. Am. Tel. & Tel.,* 752 F.2d 1356, 1359 (9th Cir.1985) (the fourth element of a prima facie failure to promote case "is met whenever the employer continues to consider other applicants whose qualifications are

15

comparable to the plaintiff's after refusing to consider or rejecting the plaintiff."). We therefore conclude that Schoenfeld has made out a prima facie case of gender discrimination.

The district court's grant of summary judgment was based solely on Schoenfeld's inability to establish a prima facie case. The district court did not address whether defendant articulated a legitimate, non-discriminatory reason for its actions and whether plaintiff had shown pretext. Since we have all the evidence necessary to address these stages of the *McDonnell Douglas* framework, we will do so now.

2.      *Legitimate, Non-discriminatory Reason*

Once a plaintiff meets his burden of establishing a prima facie case, an inference of discrimination arises and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its hiring decision. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. In this case, Defendant claims that Boyd deferred concurring in the selection of Schoenfeld and asked for additional justification from Laumeyer because the packet of materials forwarded by Laumeyer along with the recommendation was missing the outreach statement and contained a deficient justification statement. Defendant contends that Laumeyer's additional justification memorandum did not return to Boyd's office before the certificate expired. Instead, it claims that Pardue made the decision to let the hiring certificate expire in early January 1995. According to Defendant, Pardue took this course of action because he had learned that Laumeyer had informed Schoenfeld of his "selection" for the position, in breach of the office's internal policies.

This is a legitimate, non-discriminatory reason for Defendant's failure to hire Schoenfeld. Missing necessary paperwork, bureaucratic mistakes, and violations of hiring procedures are all sufficient reasons to justify the non-hiring of an applicant. As we have previously explained, it is not the role of federal courts to second-guess the hiring decisions of business entities. *See Nix v. WLCY Radio/Rahall Comms.,* 738 F.2d 1181, 1187 (11th Cir.1984). The reason offered by an employer for an action " 'does not have to be a reason that the judge or jurors would act on or approve.' " *Id.* (quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012

16

n. 6 (1st Cir.1979)). Instead, all that matters is that the employer advance an explanation for its action that is not discriminatory in nature. *Id.*

3.      *Pretext*

Once a defendant articulates a legitimate, non-discriminatory reason for its action, the initial inference of discrimination "drops" from the case. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). The burden then shifts back to the plaintiff to show that the proffered reason was pretext for intentional discrimination and that the defendant intentionally discriminated against him. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. A plaintiff may show pretext and survive summary judgment by "presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." *Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 965 (11th Cir.1997) (citations omitted); *see Hicks,* 509 U.S. at 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) ("The fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination.").

In an attempt to show pretext, Schoenfeld relies on the same evidence that composed his prima facie case and some additional evidence. First, he contends that Laumeyer filled out and supplied all the necessary paperwork to Boyd and that Boyd's explanation for his actions was false. In support of his argument, he points to Laumeyer's deposition testimony. Second, he argues that Pardue's explanation is not worthy of credence because the certificate must have expired before he would have had a chance to act on it. In support of this proposition, he points to circumstantial evidence indicating that Pardue started work on January 8, 1995, and could not have possibly made a decision on the application package by Defendant's alleged expiration date of January 11, 1995. In addition, in his brief in opposition to Babbitt's motion for summary

17

judgment, he refers to inconsistencies in the given expiration date of the certificate as undermining the truthfulness of the proffered explanation.[7] (R. 1-32).

Considering Schoenfeld's second argument first, we believe that there is evidence in the record from which a rational fact finder could conclude that Pardue's proffered reason for letting the merit staffing certificate expire was false. Although this would seem to be a readily ascertainable fact, the record contains conflicting evidence as to when the certificate actually expired. The parties agree that a certificate was valid for only 60 days after its issuance and that one 30 day extension could be approved. (R. 2-37 at 17; R. 2-45 at 46.) The certificate in this case was issued on October 11, 1994. It contained a statement that it would expire sixty days later, at the close of business on December 12, 1994. (R. 2-52 at Ex. 13F.) An instruction memorandum signed by Scott White also stated that "[t]his Certificate must be returned to the Division of Personnel by close of business, *December 12, 1994*." (R. 2-52 at Ex. 13E (emphasis in original).) The memorandum further provided that "[i]f you cannot make a selection within 60 days from the issue date of the certificate, submit a request for an extension in writing to the Division of Personnel." (*Id.*)

According to Pardue, the certificate expired on January 11, 1995. In order for this date to be accurate, a 30 day extension from the December 12, 1994 date on the certificate must have been requested and approved. Scott White testifies in his deposition that he cannot recall whether an extension was given in this case, but if one was not given, then the certificate would have expired in 60 days, and it would not have been possible to grant an extension retroactively. (R. 2-45 at 46-47.) Sandra Anderson, an employee with Personnel who was White's assistant, testified that no extension had been granted in this case. (R. 2-37 at 18.) She was the individual who typed the certificate in the first instance and the one who typed the forms notifying the applicants that the certificate had expired. (R. 2-37 at 9-11.) If her testimony is credited, as it

---

[7]In his Statement of Material Facts, Disputed and Undisputed, That Preclude Summary Judgment attached to his response to Defendant's motion for summary judgment, Schoenfeld indicates that he had been given inconsistent dates for when the certificate expired. (R. 1-31 at 19 %57 85.) He contends that he was told it had expired on December 2nd, December 12th, and then Pardue told him it had expired on January 11, 1995. (*Id.*)

18

must be on summary judgment, then the certificate would have expired at the close of business on December 12, 1994.

If a jury were to accept this expiration date, then it would make Pardue's entire explanation as to why he let the certificate expire irrelevant. Instead, the key issue in this case would be whether Boyd had a legitimate reason for not concurring in the selection and forwarding it up the appropriate channels once he received the recommendation prior to its expiration in early December.

On this point as well, Schoenfeld has met his burden of producing sufficient evidence to create a material issue of fact on Boyd's actual motivation and handling of the certificate. Schoenfeld has offered the testimony of Laumeyer that he properly filled out the paperwork and included all the necessary forms when he initially sent the package out. (R. 2-40 at 18-24.) He has also offered Laumeyer's testimony that Human Resources, nevertheless, held up the recommendation twice. First, it came back for a "fleshing out" of the outreach plan. (R. 2-40 at 18-20.) After that was done, it came back for an unclear "further justification" and a request for consideration of a specific female candidate. (R. 2-40 at 24-27.) This evidence sufficiently casts Boyd's explanation for his actions into doubt.

In addition to casting doubt on Defendant's proffered explanation for its action, Schoenfeld has offered additional circumstantial evidence of discrimination. As discussed in the analysis of Schoenfeld's prima facie case, the record contains statements by Boyd and others that one of the reasons the certificate was sent back for further justification was because Laumeyer had selected a male. Although not direct evidence, these statements still suggest a possible improper motive. There is also testimony in the record by McElwee that the only time that she knew of further justification being requested by Human Resources was when a male was selected by the initial-selecting officer. (R. 2-46 at 24-25.) Finally, although clearly not direct evidence, there is Laumeyer's testimony that he felt pressured to hire a female applicant and he believed that if he had selected the female applicant, the recommendation would have been approved without any problems. (R. 2-40 at 46-48, 60).

19

This evidence, combined with the other evidence advanced to raise a prima facie case of discrimination, is sufficient to create a material question of fact regarding whether defendant intentionally discriminated against Schoenfeld on the basis of his gender.  As a result, we conclude that the district court erred in entering summary judgment for Defendant on Schoenfeld's gender discrimination claim.

## V. Conclusion

For the foregoing reasons, we AFFIRM the district court order granting defendant's motion for summary judgment on plaintiff's race discrimination claim but REVERSE that portion of the order granting summary judgment on the gender discrimination claim.

AFFIRMED IN PART AND REVERSED IN PART.