[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 16, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-14982
Non-Argument Calendar
_____

D. C. Docket No. 04-00308-CV-HLM-4

WILLIAM LAYTON ROBERTS,

Plaintiff-Appellant,

versus

RANDSTAD NORTH AMERICA, INC.,
RANDSTAD STAFFING SERVICES, L.P.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(May 16, 2007)**

Before BIRCH, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

William Layton Roberts appeals the district court's grant of summary judgment to Randstad North America and Randstad Staffing Services (collectively "Randstad") in his action alleging discriminatory termination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. We AFFIRM the district court's grant of summary judgment to Randstad.

## I. BACKGROUND

Roberts, a male, filed a complaint against Randstad pursuant to Title VII,[1] which alleged that Roberts's supervisor, Jan Harding-Baker, a female, was biased against men, and that a complaint made by Harding-Baker had led Randstad managing director of operations Genia Spencer to terminate Roberts's employment.

Roberts began working for Randstad in northern Georgia in 1994 as a district manager, was promoted to regional business development manager in November 2000. After the elimination of this position in August 2002, Roberts became a market manager, a position with substantially the same duties as the district manager position. Roberts's manager at this time was Eric Buntin. In March 2003, Harding-Baker became Roberts's supervisor. Roberts's performance evaluations from Randstad generally showed acceptable ratings.

---

[1] Roberts also lodged a claim for breach of his employment contract. That claim, however, is not before us on appeal.

Randstad had a staffing account with Pirelli. In 2003, Roberts transferred the Pirelli account from Teresa Lanter, a former subordinate of Roberts, to a new male agent, Clem Trammell. Roberts denies Lanter's story, but Lanter claimed that Roberts had stated that he transferred the account because the female manager at Pirelli "related better to men" and "Pirelli needs more testosterone." R1-26, Exh. A at 2. Lanter reported these alleged statements to Harding-Baker. Roberts later stated that he moved the Pirelli account because he had been informed that Randstad would lose the account because Lanter and co-agent Josh Sellings had no sense of urgency. Roberts stated that on the day before he was fired he first learned that Lanter had complained to Harding-Baker about Roberts.

Roberts also had a dispute with Randstad regarding an alleged $9,800 overpayment that Randstad made to Roberts for his car allowance. Harding-Baker had been the one who originally discovered the alleged overpayment. She first went to Elizabeth Strickland to confirm whether Roberts was entitled to such a high allowance, in part, because she was suspicious of Roberts. After Strickland had informed Harding-Baker that she thought there was an overpayment, Harding-Baker confronted Roberts. Harding-Baker did not believe Roberts's assertions that he thought the allowance was inadvertently increased or that it was increased as a result of Roberts's promotion to market manager. Harding-Baker gave Roberts the option of either immediately repaying the money or having $500 per paycheck

deducted until the sum was made up. Roberts responded: "neither. I need to find out more about that." R1-27 at 49. Roberts did not refuse to pay the money, instead stating that he "wanted to do the right thing, whatever that was." Id. at 50. Roberts also contacted Steven Whitehead, Randstad's general counsel, and reiterated his position.

In 2003, Randstad began "Mass Customized," a company-wide marketing initiative, which was a major focus of Randstad in the fall of 2003. As a market manager, one of Roberts's duties in the "Mass Customized" initiative was to verify Randstad's information on potential client companies, which was obtained from marketing firm Claritas. This task was to be completed by the market manager personally, not subordinates. It has been alleged, though Roberts did not recall, that he had agent Nakita Whatley, a subordinate of Roberts, assist him in the validation process. Roberts agreed that he might have asked his agents whether a particular company was already in Randstad's database or if they knew of any other information on the company.

Roberts later attended an 22 October 2003 "Mass Customized" initiative progress meeting, at which Harding-Baker was present. Harding-Baker told Roberts that she thought he should "have been further along" in the client validation process. Id. at 68, 73. Harding-Baker noted that Roberts's validation list had been faxed to him from one of his branches. She accused Roberts of

4

having not done the work himself. Harding-Baker later contacted Whatley and asked whether she had assisted Roberts with the "Mass Customized" initiative validations. Whatley clearly told Harding-Baker that she had not assisted Roberts and stated that it was well-known in the office that Roberts had personally performed the validations.

Roberts stated that he did not recall what his response, if any, to Harding-Baker's accusation had been, and did not seem to recall whether the accusation was accurate. Roberts later stated that he had made no response because Harding-Baker had immediately raised the topic of Lanter's complaint. Roberts told Harding-Baker why he had transferred the Pirelli account.

Before these incidents had arisen, Roberts had been identified to Steven Whitehead, who became Randstad's general counsel in 2001, as an employee with possible integrity problems. Whitehead's former supervisor had specifically cautioned Whitehead that he had concerns with Roberts's "morality" and "integrity," and had directed Whitehead to "keep [an] eye" on Roberts because Roberts "could potentially put the company at risk." R2-32 at 18. Whitehead was also aware that Roberts had been accused of having a sexual relationship with a subordinate and, shortly thereafter, had married her. Whitehead believed that Roberts had been lying when he denied the affair. When Whitehead became general counsel, he also learned that Roberts had never performed well

5

commercially.

When Whitehead spoke to Roberts regarding the alleged car allowance overpayment, Whitehead believed that Roberts was required to repay the money and thought that Roberts conducted himself like a "snake-oil salesman" during the meeting. Id. at 28. Whitehead believed he had made it clear that Roberts needed to repay the money to keep his job. Whitehead decided that he would allow Roberts "to sleep on it" before terminating his employment. Id. at 30-31.

After meeting with Roberts but before Whitehead terminated Roberts, Randstad's human resources manager Stacey Williams notified Whitehead of additional reports of misconduct by Roberts, including: a complaint by Lanter regarding the alleged Pirelli account comments; and a complaint by Harding-Baker regarding her belief that Roberts had not met his "Mass Customized" initiative responsibilities and made misrepresentations during a "Mass Customized" initiative meeting that had occurred the day before, 22 October 2003. While Whitehead had an existing good impression of Lanter at the time, his only knowledge of the incident came from Williams's report of Lanter's allegation. Roberts was not interviewed because Whitehead had already found Roberts to be not credible, and Whitehead assumed Roberts would simply deny the allegations. Roberts was terminated the day after the October 22 "Mass Customized" initiative meeting. Randstad records reflected that Roberts was terminated on 23 October

2003 for "unsatisfactory performance and dishonesty."  R1-27, Exh. 10.

Whitehead could not say whether he would have fired Roberts for the comment alone, because his decision was made "based upon the entirety of the facts."  R2-32 at 43.  He stated: "based upon all . . . the factors . . . I made the decision that we didn't need [] Roberts in our organization any longer.  In fact, we couldn't afford to keep [] Roberts in our organization one minute longer."  R2-32 at 22.  Whitehead also stated that "any one of [the complaints] would have been reason for terminating [] Roberts."  Id. at 24.  Whitehead's basis for his beliefs about Roberts's conduct with the "Mass Customized" program was Harding-Baker's statements on the matter, which were reported to him by Williams. Whitehead stated that his decision was influenced by the information provided by Williams, his own conversation with Roberts, and the fact that Whitehead believed Roberts owed Randstad for the alleged car allowance overpayment.  Whitehead also stated that Roberts's termination was "imminent" at the time Roberts did not agree to pay the money back after being given a night to "sleep on it."  Id. at 61. Whitehead stated that the additional information from Williams merely "sped" the matter up and "cut . . . off" the need to examine the issue and take additional steps. Id. at 62-63.

Harding-Baker stated that she was not involved the decision to terminate Roberts and did not recommend Roberts's termination, but only provided

information to Williams about the October 22 meeting where, she believed, Roberts had arrived unprepared and then was dishonest in reporting his progress. Harding-Baker conceded that at the time of the October 2003 meeting, existing "trust issues" with Roberts, based on her occasional inability to locate him at his branches, including one occasion on which Harding-Baker thought Roberts had lied to her about where he was. Id. at 128-30. Harding-Baker testified that her first impression of Roberts was that he was a "nice, southern gentleman, polite, well-spoken, polished." R2-33 at 80. She did not have any negative impressions about him at that time. At the time, Harding-Baker felt Roberts was competent to perform his job. Harding-Baker had heard rumors about Roberts's affair with a subordinate. Some of Roberts's employees had also complained that he was hard to find.

Williams called Harding-Baker and informed her that Whitehead had decided to terminate Roberts. Harding-Baker was "a little bit" surprised to learn that Roberts would be terminated. Id. at 94. She thought the decision was drastic, although correct. Harding-Baker stated that she would not have fired Roberts, but later stated that although she would not have fired him based on the performance issues alone, she would have fired him based on the totality of his problems. Paige Passons, a female, took over Roberts's responsibilities after he was terminated.

Other than Harding-Baker, Roberts did not believe that any other person

8

involved in his termination had discriminated against him on the basis of his sex. Roberts recounted that Harding-Baker had commented to Roberts that he made more money than any of her female managers. Mandi Culpepper, who worked with Roberts and Harding-Baker in 2003, was of the "firm impression that [Harding-Baker] was biased against men in general and [] Roberts in particular." R1-31, Attachment 3 at 2. According to Culpepper, Harding-Baker was "open, communicative, and friendly with females," but "direct, abrupt, closed, and uncomfortable with males." Id. Additionally, Culpepper stated that Harding-Baker would mingle with females but ignore or exclude males. Culpepper heard Harding-Baker speak negatively of Buntin and Roberts, but never heard her speak negatively of a female manager. Culpepper stated that Harding-Baker would withhold information from Roberts on new programs being implemented by Randstad, then complain when his branches had not progressed as much in the programs as others had.

Lorna Hall, one of Roberts's subordinates in 2003, also stated her belief that Harding-Baker was more communicative with her female market managers about new programs being implemented by Randstad, but would withhold the same information from Roberts. Hall stated that this withholding caused problems with respect to a June 2003 increase in the amount charged to clients, because Roberts's lack of information on the changes left him unable to give the clients advance

9

notice.

Randstad moved for summary judgment and the magistrate judge issued a report that recommended the dismissal of Roberts's claims. Roberts filed objections to the magistrate judge's report and recommendation and the district court denied the objections, adopted the report and recommendation and granted summary judgment to Randstad. Roberts now appeals the district court's grant of summary judgment as to his Title VII claim.

## II. DISCUSSION

We review the district court's grant of summary judgment <u>de</u> <u>novo</u>, applying the same legal standards as the district court, and viewing all facts and reasonable inferences drawn therefrom in the light most favorable to the non-moving party. <u>Hinson v. Clinch County, Ga. Bd. of Educ.</u>, 231 F.3d 821, 826-27 (11th Cir. 2000). Summary judgment is appropriate where the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. <u>Id.</u> at 826 (citing Fed. R. Civ. P. 56(c)). We must give weight to both the evidence favoring the non-moving party and evidence supporting the moving party, to the extent that the evidence supporting the moving party is uncontradicted, unimpeached, and comes from a disinterested source. <u>Id.</u> at 827. "In other words, we must consider the entire record, but disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Id.</u> (citation

10

and internal quotations omitted).

Where, as here, an employee alleges discriminatory termination in violation of Title VII, but does not have direct evidence of discrimination, we apply the burden-shifting framework of McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). Hinson, 231 F.3d at 828. Under the McDonnell-Douglas framework, a plaintiff alleging discriminatory termination must first establish a prima facie case by showing that: (1) he was a member of a protected class; (2) he was suffered an adverse employment action; (3) he was qualified for the position held; and (4) he was replaced by a person outside of the protected class. Id. Where a prima facie case is established, the burden falls on the employer to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. Id. at 830. Where the employer does so, the burden then returns to the plaintiff to show that the reasons articulated were a pretext and that the real reason was discriminatory. Id. On appeal, it is undisputed that Roberts established a prima facie case of discriminatory termination and that Randstad articulated legitimate, non-discriminatory reasons for the termination. Accordingly, we focus on whether Roberts has established that Randstad's articulated reasons were pretextual.

Roberts argues that the district court erred in finding that he had not presented evidence from which a jury could infer that his supervisor, Jan Harding-

11

Baker, was biased against men, including himself. Roberts acknowledges that Steven Whitehead, the ultimate decision-maker, held no discriminatory animus. He argues, however, that Harding-Baker's discriminatory animus was imputed to Whitehead based on a "cat's paw" theory of liability, under which, in certain circumstances, the discriminatory animus of a non-decisionmaking employee can be imputed to the neutral decisionmaker when the decisionmaker does not conduct his own independent investigation. See Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998). "In such a case, the recommender is using the decision maker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) (per curiam) (citation omitted). Essentially, where the individual accused of discriminatory animus is "an integral part" of a multi-level personnel decision, their improper motivation may "taint[ ] the entire ... process." Schoenfeld v. Babbitt, 168 F.3d 1257, 1268 (11th Cir. 1999). Therefore, in order to survive summary judgement, Roberts must be able to show that Harding-Baker harbored a discriminatory animus against him and "the decisionmaker[, that is, Whitehead] acted in accordance with the harasser's decision without [himself] evaluating the employee's situation." See Llampallas, 163 F.3d at 1249 (citation omitted).

Upon careful consideration of the briefs of the parties, and thorough review

of the record, we find no reversible error. The district court did not err in granting summary judgment to Randstad because Roberts has not presented evidence that could reasonably allow a jury to conclude that Harding-Baker harbored a discriminatory animus against men, rather than simply disliking Roberts. Moreover, the evidence reveals that Whitehead conducted his own independent evaluation of Roberts. See Stimpson, 186 F.3d at 1332 ("[The 'cat's paw'] theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee.").

Roberts's evidence supporting an inference of gender bias essentially amounts to: (1) Harding-Baker was more socially comfortable with females than with males; (2) Harding-Baker took a variety of negative actions against Roberts, such as creating false negative reports on him and withholding information he needed to run his branch properly; and (3) when Roberts was terminated, Harding-Baker replaced him with a female manager.[2] Pretext cannot be established simply by making a prima facie case and "[d]islike alone is not evidence of [] discrimination," Hawkins v. Ceco Corp., 883 F.2d 977, 986 (11th Cir. 1989).

---

[2] Roberts also argues that bias can be inferred from Harding-Baker's first impression that Roberts was a "nice, southern gentleman, polite, well-spoken, polished." R2-33 at 80. While "gentleman" is a gender-specific term, it is also a compliment, and in no way shows discriminatory animus.

13

Therefore, Harding-Baker's actions against Roberts and the promotion of a woman to replace him are, even together, insufficient to demonstrate discriminatory animus toward men, much less one that could be imputed to Randstad.

To show discriminatory animus, Roberts must primarily rely on Harding-Baker's generalized shortcomings in social interactions with her male employees. This is a burden that the evidence cannot bear. To defeat summary judgment, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). That Harding-Baker was more "open" and "communicative" with other women, while more "direct" and "closed" with men, R1-31, Culpepper Aff. at ¶ 3, 5, is only a "mere scintilla" of evidence, but not enough from which a reasonable jury could infer a general bias against men.

Moreover, Whitehead, the person who fired Roberts, did so after an independent analysis of Roberts employment. While he considered information that Harding-Baker relayed to Williams, who reported it to Whitehead, Whitehead met with Roberts personally, and drew upon information concerning multiple sources, and independently evaluated Roberts's employment. Stimpson, 186 F.3d at 1332 (holding that the "cat's paw theory" may be utilized by the plaintiff to prove "that the discriminatory animus behind the recommendation caused the

14

discharge . . . if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating" the recommendation). As a result, Roberts's "cat paw" theory fails.

### III. CONCLUSION

Roberts cannot show that Harding-Baker's animus was discriminatory in nature. Moreover, Whitehead's decision to terminate Roberts was sufficiently independent to preclude Roberts from successfully raising a "cat's paw" theory of liability. Accordingly, the district court's grant of summary judgment to Randstad is **AFFIRMED.**