**Danny CREWS, Plaintiff,**

v.

**FIRST CORRECTIONS CORPORATION, et al., Defendants.**

**No. CA 99–0440–MJ–C.**

United States District Court, S.D. Alabama, Northern Division.

April 10, 2000.

---

Yancey N. Burnett, Mobile, AL, for Plaintiff.

Leslie M. Allen, Balch & Bingham, Montgomery, AL, Warren David Harless, Christian & Barton LLP, Richmond, VA, for Defendants.

## MEMORANDUM OPINION AND ORDER

CASSADY, United States Magistrate Judge.

This cause is before the Court on the defendants' motion for summary judgment (Doc. 14; *see also* Doc. 15 (brief in support of the motion for summary judgment); Doc. 16 (evidentiary materials filed in support of the motion for summary judgment)), the plaintiff's brief in opposition to the summary judgment motion (Doc. 19; *see also* Doc. 18), and the defendants' reply brief (Doc. 20). The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings, including disposition of this motion. (*See* Doc. 9 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, including the trial, order the entry of a final judgment, and conduct all. post-judgment proceedings.")) Upon consideration of the contents of the briefs and all pertinent materials submitted in support of the briefs, the Court **GRANTS** the motion for summary judgment on plaintiff's sole remaining claim [1] and **ORDERS** that plaintiff's complaint be **DISMISSED WITH PREJU-**

---

1. Plaintiff raised two claims in his complaint: a Title VII race discrimination claim and a claim of race discrimination under 42 U.S.C. § 1981. (Doc. 1) On June 7, 1999, the defendants filed a motion to dismiss plaintiff's Title VII claim on the basis that it was time-barred since this civil action was not filed within 90 days of the Equal Employment Opportunity Commission's Dismissal and Notice of Rights. (Doc. 4; *see also* Doc. 5) The defendants'

DICE.[2]

## FINDINGS OF FACT

1. First Corrections Corporation, a wholly owned subsidiary of Alternative Behavioral Services, Inc., operates detention and correctional facilities in the United States and Puerto Rico under contract with state and local juvenile justice systems. (Doc. 16, Declaration of Patricia Aydlett, ¶ 3) First Corrections operates the West Alabama Youth Services, Inc. ("WAYS") facility in Greensboro, Alabama under contract. (Id., at ¶ 4) WAYS is a 30–bed maximum security detention facility for juveniles awaiting adjudication of various charges. (Id.)

2. Danny Crews was hired as a juvenile detention officer at WAYS in the latter part of July of 1997 by Joe Carpenter. (See id., at ¶ 5; Doc. 16, Danny Crews Deposition, at 20–21 & 117–119) Although it appears from Crews' personnel file that Crews' ultimate employer was First Corrections Corporation (see Doc. 18, Plaintiff's Exhibit 1), it is all too clear that Joe Carpenter, the administrator of WAYS, terminated plaintiff (Doc. 16, Crews depo., at 67; see Doc. 18, Plaintiff's Exhibit 3 ("Effective May 5, 1998, your employment with West Alabama Youth Services is considered a voluntary quit."))

3. Crews, a Greensboro, Alabama native (see Doc. 16, Crews depo., at 6), failed to report for work at WAYS, as scheduled, on May 1, 1998, May 3, 1998 and May 4, 1998 (id., at 58–65). Crews' scheduled days off in April and May of 1998 were Saturdays and Tuesdays. (See id., at 64) Crews worked the 10 p.m. to 6 a.m. shift at the WAYS facility. (See id., at 93)

4. On Friday May 1, 1998, Crews called the detention facility and reported that he would not be at work. (Doc. 16, Aydlett declaration, at ¶ 10 & May 1, 1998 Office Note; Crews depo., at 53–54) Crews testified at his deposition that he probably called work at 6:30 p.m. that Friday (id., at 54); however, contemporaneous office notes reveal that plaintiff's call was received by the facility at 10:45 p.m. (See Aydlett declaration, at ¶ 10 & May 1, 1998 Office Note). Those same office notes reveal that the reason given by Crews for his absence that night was "a hospital situation[]" (id.) but his deposition testimony reveals that he and his girlfriend, Angie Poole, simply planned that he would not report to work that particular night (Crews depo., at 58–60).

5. At approximately 6:00 p.m. on Friday May 1, 1998, Crews, Angie Poole and three minors, Cinda Coates, Mallie Ayers and Brandon Jones, were taking turns riding Jones' three-wheeler. (Crews depo., at 32–33) Sometime thereafter, Crews drove Ayers and Jones to the store and on the way back dropped them off about a block and a half from Poole's trailer. (See id., at 33–34)

6. On the morning of Saturday May 2, 1998, Crews was arrested on a third-degree kidnapping charge made by Mallie Ayers' mother. (See id., at 25–26, 46 & 55) Crews remained incarcerated on this charge until Monday night May 4, 1998 at

---

motion to dismiss was granted by the Court in its July 27, 1999 Rule 16(b) Scheduling Order. (Doc. 11, ¶ 18 ("The Title VII claim is time barred, since it was not filed within ninety days of the Equal Employment Opportunity Commission's Dismissal and Notice of Rights that was issued on January 29, 1999. 42 U.S.C. § 2000e–5(f)(1).")) Accordingly, plaintiff's sole remaining claim is his race discrimination claim made pursuant to 42 U.S.C. § 1981.

**2.** Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (See Doc. 9 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court."))

approximately 6:00 or 6:30 p.m. (*See id.,* at 52–53)

7. Neither Crews nor anyone on his behalf called the WAYS facility on May 2, 1998 because that was his scheduled day off. (*Id.,* at 60)

8. On Crews' next scheduled workday, Sunday May 3, 1998, his friend, Angie Poole, called WAYS for him at approximately 10:00 p.m.; she did not tell WAYS that he was incarcerated. (*Id.,* at 60–61) WAYS' contemporary business records reveal that at 4:10 p.m. on May 3, 1998 "Angie called to inform . . . that . . . Crews [would] not be able to report to work[.]" (Doc. 16, Aydlett declaration, at ¶ 10 & May 3, 1998 Office Note)

9. Crews was also scheduled to work on Monday May 4, 1998. (*See* Doc. 16, Crews depo., at 61–62) Crews testified that Poole again called WAYS for him and informed the facility he would not be working that night. (*Id.*)[3] "Someone put her on hold for a supervisor and the phone went dead." (*Id.*) The facility's contemporaneous business records reveal that an unidentified female called at 7:10 p.m., advised that Crews would not be at work again that night, and hung up the phone after being asked to hold for a supervisor. (Doc. 16, Aydlett declaration, at ¶ 10 & May 4, 1998 Office Note) Later that night at approximately 9:37 p.m., Crews' mother called the facility and stated that Crews would be back at work Wednesday night, May 6, 1998, his next scheduled workday. (*See id.*)

10. Crews spoke by phone with Joe Carpenter on May 6, 1998, before the start of his shift, and was informed by Carpenter that he was being terminated due to noncompliance with the company's "call yourself" attendance policy and would be receiving a termination letter from Virginia. (*See* Doc. 16, Crews depo., at 65–68)

A few days later, Crews received the following letter by certified mail:

It has come to my attention that you have been absent from the workplace, West Alabama Youth Services, for three (3) consecutive work days without proper notification (employee must make the call himself) given to your supervisor (Attendance & Punctuality policy, Section 2, No. 5, II.G & N; Employee Behavior & Conduct policy, Section 4, No. 1, II.C.7). In accordance with Human Resources policies and procedures, "an employee is considered to have voluntarily resigned his position without notice if he is absent three consecutive working days without notifying his supervisor" (Voluntary Termination, Section 1, No. 24, II.K).

Effective May 5, 1998, your employment with West Alabama Youth Services is considered a voluntary quit. Information with regard to continuation of benefits will be forwarded to you under separate cover.

(Doc. 18, Plaintiff's Exhibit 3)

11. The Alternative Behavioral Services and FHC Health Systems Attendance and Punctuality Policy reads in its entirety as follows:

### I. POLICY

Alternative Behavioral Services and FHC Health Systems require employees to report for work punctually as scheduled and to work all scheduled hours and required overtime. Excessive tardiness and poor attendance disrupt work flow and client care and will not be tolerated.

### II. PRACTICE

A. Absence is failure to report for and remain at work as scheduled and includes all time lost from the job. The

---

**3.** Poole again called despite the fact that Crews was released from jail Monday May 4, 1998 at approximately 6:00 or 6:30 p.m. (*See id.,* at 52 & 63)

only exceptions to this definition of absence are holidays, vacation, bereavement leave, jury duty, military duty, workers' compensation, approved leaves of absence and when no work is scheduled.

B.  Tardiness is reporting for work past the scheduled starting time. Pay will not be docked unless five (5) or more minutes late in reporting to work.

C.  Occurrence is an absence of one or more days separated by one or more days of work.

D.  Excessiveness is defined

1.  *Tardiness* is deemed chronic when there are more than five (5) occurrences in a calendar year.

2.  *Absenteeism* is deemed chronic when there are more than five (5) occurrences in a calendar year[.]

E.  Supervisors should notify employees of their starting, ending, and break times. Employees should be ready to begin working at the scheduled starting time and are expected to be engaged in carrying out their duties during all scheduled work time. Supervisors should record all absences and any tardiness.

F.  When there is an abuse of attendance and punctuality, as defined by excessive in item D1 and D2, or an employee incurs an absence or tardy without notice, disciplinary action will be initiated, in accordance with the Employee Behavior and Conduct Policy. Each subsequent event of tardiness or absenteeism will result in progressive discipline. Employees who have five or fewer occurrences of tardy or absence at the beginning of each calendar year will have the number of occurrences reduced to zero.

G.  Employees should notify the immediate supervisor as far in advance as possible whenever they are unable to report for work or know they will be late.

1.  The employee must make the call himself unless he has a valid excuse for the inability to call.

2.  The employee must state the specific reason for the absence.

3.  The employee must indicate when he can be expected to report for work.

4.  The employee must notify the supervisor minimally two (2) hours prior to the day shift and four (4) hours prior to all other shifts each day of absence.[4] Failure to do so may result in denial of PAL or sick leave pay and may be grounds for disciplinary action. (See Sick Leave Policy)

H.  The Organization reserves the right to require acceptable confirmation of the nature and extent of any illness[,] injury, or event that requires employees to be absent from scheduled work or results in an absence of more than three (3) days. (See Sick Leave and Leave of Absence Policies)

I.  Employees will be compensated for absences in accordance with the Paid Annual Leave and Sick Leave Policies.

J.  Employees should notify their supervisor when the[y] leave the premises during work hours. In addition, employees who are frequently away from the premises for business reasons should inform their supervisors of the[ir] whereabouts during work hours.

K.  Employees who report for work in a condition deemed not fit for work, whether for illness or any other reason, will not be allowed to work. (See Employee Health and Drug Free Work Environment Policies)

L.  Employees are expected to report for work during inclement weather con-

---

**4.** Plaintiff was well aware of this four-hour rule. (Doc. 16, Crews depo., at 54)

ditions if the Organization does not declare a weather emergency. (See Inclement Weather Policy)

M. Employees will not be required or permitted to work any period of time before or after scheduled starting or quitting time for the purpose of making up lost time because of tardiness or absence, unless authorized to do so in advance by their manager. (See Hours of Work Policy)

N. Employees who are absent for three (3) consecutively scheduled work days without giving proper notice to the Organization will be considered as having voluntarily quit. The Organization will formally note the termination and advise the employee of the action by certified mail. (See Voluntary Termination Policy)

O. Employees are expected to maintain good personal health which will allow them to perform their work in a competent manner on a regular basis and avoid letting minor dispositions keep them from performing their jobs. At the same time, employees should exercise good judgment with respect to contagious ailments which might have an adverse effect on clients and coworkers.

P. Supervisory employees are expected to set good attendance and punctuality examples for subordinates; keep attendance records on all staff; resolve absence and tardiness problems of supervised employees; notify employee in advance if he needs to submit a physician's statement in support of absence; recognize that health is a personal matter and respect each employee's right to privacy by discussing an employee's health only as required to discharge supervisory responsibilities; counsel employees on the importance of good attendance; and warn that excessive tardiness, regardless of causes, will lead to disciplinary action.

(Doc. 16, Aydlett declaration, ATTENDANCE AND PUNCTUALITY (footnote added))

12. The Alternative Behavioral Services and FHC Health Systems Employee Behavior and Conduct Policy reads in its entirety as follows:

## I. POLICY

Alternative Behavioral Services and FHC Health Systems recognize that certain rules and regulations regarding employee behavior are necessary for the efficient operation of the Organization and for the benefit and safety of all employees and clients. Conduct which interferes with operations, discredits the Organization, or is offensive to clients, guests or fellow employees will not be tolerated.

## II. PRACTICE

A. Employees are expected at all times to conduct themselves in a positive and professional manner so as to promote the best interests of the Organization.

B. The following conduct, on Organization time or property, is prohibited and considered a minor violation of Organization policy and will subject the individual involved to disciplinary action. (See Disciplinary Procedure Policy)

1. Chronic absences.

2. Chronic tardiness.

3. Failure to call in absence or tardiness in accordance with Organization procedures.

4. Abuse of break times and meal periods.

5. Eating or taking breaks in unauthorized area.

6. Parking in unauthorized areas; failure to follow parking policies.

7. Posting, altering or removing material on bulletin boards or property without authorization.

8. Accepting tips or gifts from clients or guests.

9. Conducting personal business/work during paid time.

10. Failure to attend annual in-service review within policy defined time frames.

11. Failure to adhere to Problem Resolution Procedure.

12. Engaging in behavior which has a negative effect on the morale and work of fellow employees.

13. Violation of Organization policies and procedures which do not endanger or affect others.

14. Other job related problems which do not respond to counseling and adversely affect employee's work performance.

C. The following conduct on Organization time or property, is prohibited and is considered a major violation of Organization policy and will subject the individual involved to disciplinary action. (See Discipline Policy)

1. Disclosure of confidential client information or documents to unauthorized individuals.

2. Communication with the media regarding clients or other staff which violates confidentiality. (See Confidentiality Policy)

3. Insubordination, including refusal or failure to follow instructions from a supervisor.

4. Unauthorized absence from work area, including walking off the job.

5. Refusal to work scheduled hours.

6. Failure to respond to on-call emergencies or request to come to work.

7. Absence of three (3) consecutive scheduled work days without proper notification. (See Voluntary Termination Policy)

8. Omission, falsification, destruction of information related to employment, payroll, medical/clinical record, or other Organization records or reports.

9. Breach of computer access; i.e., sharing sign-on and password codes; intentional tampering, corrupting and damage of computerized information pertaining to clients and organizational functions; violation of e-mail policy.

10. Misuse or loss of facility keys.

11. Misuse, neglect or destruction of Organization property, equipment or records, including unauthorized removal or use for private purpose.

12. Threatening, intimidating, harassing or coercing behavior.

13. Neglect, abuse or endangerment of others.

14. Rude, discourteous behavior; profane, abusive, obscene language.

15. Breach of safety rules.

16. Smoking in unauthorized area.

17. Horseplay.

18. Failure to report an on-the-job accident; failure to follow the Worker's Compensation Policy.

19. Being under the influence of controlled substances, alcohol, or illegal drugs.

20. Conviction of a felony.

21. Gambling.

22. Immoral, indecent or disorderly conduct.

23. Breech of Organization Code of Ethics.

24. Participation in unauthorized non-therapeutic personal relationships with current and/or former clients during on-duty and/or off-duty work hours.

25. Violation of unit, department or Organization policies or procedures which endanger others.

26. Having knowledge of and failing to report to a supervisor a rule violation.

27. Other serious offenses resulting in malfunction of unit, department or Organization[ ], in degradation of client care and safety.

D. The following conduct on Organization time or property is prohibited and considered a major violation which will result in immediate termination.

1. Falsification of application for employment and/or· any other document relating to the hiring process.

2. Theft of Organization property.

3. Fighting; physical assault of client or co-worker.

4. Sleeping on the job.

5. Walking off the job. (See Voluntary Termination Policy)

6. Possession or consumption of controlled substances illegally, alcohol or drugs.

7. Possession of weapons, firearms, or explosives, real or facsimile.

E. Infractions of "B," "C" and "D" above will be documented on an Employee Disciplinary Report in accordance with the Discipline Procedure Policy.

F. The examples in "B," "C" and "D" above are illustrative of the type of behavior which will not be permitted, but are not intended to be an all-exhaustive listing. As appropriate, additional rules may be established at the Organization and/or Department level. Any violation of the Organization's policies or any conduct considered inappropriate or unsatisfactory may, at management's discretion, subject the employee`to disciplinary action. Any questions in connec-

tion with this policy should be directed to the Director of Human Resources.

(Doc. 16, Aydlett declaration, EMPLOYEE BEHAVIOR AND CONDUCT)

13. Plaintiff testified during his deposition that the defendants' treatment of him was different than the manner in which they treated certain black employees, namely Robert Jackson, Officer Howard,[5] and Jessie Wiggins. (*See generally* Crews depo., at 88–114) According to Crews, Jackson missed worked almost every other Friday, at times would not call in, and was once suspended for three days rather than being fired. (*Id.*, at 88–90) Howard, who plaintiff admits was terminated, was treated more fairly than he because that officer had a drinking problem and was leaving the facility during work hours yet was not terminated· until after this conduct had been "going on for a while." (*Id.*, at 100 & 104) Finally, plaintiff contends that Jessie Wiggins, a black officer with numerous disciplinaries (*id.*, at 110), was treated more favorably: "Well, he's repeatedly got things there. I'm up against the deal with the other two blacks that I already don't know what happened, and then Wiggins has all this in his file. Wiggins even gets thinking that people are after him." (*Id.*, at 114–115)

14. Plaintiff testified during his deposition that he has no knowledge that Jackson, Howard or Wiggins was ever unable to report to work due to incarceration nor does he have any knowledge about whether any of these three officers ever failed to personally report an absence for three consecutive workdays. (*Id.*, at 134–135)

15. Jackson and Howard are no longer employed at WAYS. (Doc. 16, Aydlett declaration, at ¶¶ 17 & 18)

Robert Jackson was employed by First Corrections as a detention officer

---

**5.** Plaintiff identified this particular detention officer as Officer Howell. (Doc. 16, Crews depo., at 99) However, Crews' physical description of this officer (*id.*) and his uncertain-

ty about the name allowed the defendants to identify the individual concerned as Mance Howard (*see* Doc. 16, Aydlett declaration, at ¶ 18).

at WAYS from September 30, 1996 until on or about February 25, 1998 when he voluntarily resigned rather than face termination under the company's progressive discipline program. Mr. Jackson had been counseled and warned for failure to advise the company that he would not be reporting to work. Because each occasion dealt with one scheduled work day, Mr. Jackson received progressive discipline. In January of 1998 he had been suspended for three work days and was advised that the next time he failed to properly report an absence he would be terminated. He failed to properly report an absence on or about February 25, 1998. When Joe Carpenter contacted Mr. Jackson to discuss his employment status, Mr. Jackson said that he was voluntarily resigning from the company....

Mance Howard was employed by First Corrections as a detention officer at WAYS from September 30, 1996 through October 15, 1997 when he was terminated pursuant to First Corrections' progressive discipline policy after he violated company policy by walking off the job without authorization for two and one-half hours.

(*Id.*) Although Jessie Wiggins is still employed as a juvenile detention officer at WAYS, becoming first employed in December of 1996, he has twice been reprimanded by his supervisor for violating company policy requiring advance notification of intended late arrival. (*Id.,* at ¶ 19)

16. Between 1997 and the present, two black employees at the WAYS facility have been terminated under the "three consecutive workdays" provision of the Attendance and Punctuality Policy, one before May 5, 1998 and one after that date. (*Id.,* at ¶ 9)

17. Plaintiff contends that Joe Carpenter, the black administrator of WAYS, ex-

hibited racial hostility by his culture and the manner in which he dressed (by wearing African jewelry), by interviewing more blacks for jobs and just in general by carrying on more conversations with the black employees. (Doc. 16, Crews depo., at 128–133) However, Crews admitted that he never attempted to have a conversation with Carpenter where Carpenter did not speak to him and he never heard Carpenter, or any other black employee, say anything about not liking white people or not wanting to hire white people. (*Id.,* at 133) Crews never heard anyone say anything along racial lines nor did he say anything along racial lines. (*Id.*)

18. Crews admits that sometime after he was terminated he pled guilty to reckless endangerment and as part of the plea was ordered to stay away from Mallie Ayers and Brandon Jones for a year's time. (*Id.,* at 46)

### CONCLUSIONS OF LAW

#### A. *Summary Judgment Standard.*

1. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.").[6] The clear language of Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a show-

---

**6.** The substantive law will identify which facts are material. 477 U.S. at 248, 106 S.Ct. at 2510. The Supreme Court concluded in *Anderson* "that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* at 255, 106 S.Ct. at 2514.

ing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A complete failure of proof by the non-movant on an element essential to his case renders all facts immaterial, so the movant is entitled to judgment as a matter of law. *Id.* at 323, 106 S.Ct. at 2553; *see Bennett v. Parker,* 898 F.2d 1530, 1532 (11th Cir. 1990) ("Facts in dispute cease to be 'material' facts when the plaintiff fails to establish a prima facie case."), *cert. denied,* 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1085 (1991).

2. This Court must inquire "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512 (citation omitted) (emphasis in original). The party seeking summary judgment has the initial responsibility of informing the court of the basis for the motion and of establishing, based upon the discovery instruments outlined in Rule 56(c), that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. When the burden of proof at trial belongs to the nonmovant, as is the case here, the moving party need not "support its motion with affidavits or other similar materials *negating* the opponent's claim," *id.,* but rather, "a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* at 324, 106 S.Ct. at 2553. Once this initial demonstration is made, Rule 56(e) requires the nonmoving party to "go beyond the

pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.,* quoting Fed. R.Civ.P. 56(e).

> Forbidding reliance upon pleadings precludes a party from "choos[ing] to wait until trial to develop claims or defenses relevant to the summary judgment motion." ... This effectuates the purpose of summary judgment which "'is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" ... Thus, "mere general allegations which do not reveal detailed and precise facts" will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists.

*Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 592 (11th Cir.), *cert. denied sub nom. Jones v. Resolution Trust Corp.,* 516 U.S. 817, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995). In other words, there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

3. In considering whether the defendant is entitled to summary judgment, the Magistrate Judge has viewed the facts in the light most favorable to the plaintiff. *Belcher v. City of Foley,* 30 F.3d 1390, 1392 (11th Cir.1994). Therefore, what the undersigned has stated the facts to be in this opinion may not be the facts that would be established at trial. *See id.* at 1393 (citation omitted).

**B. *Section 1981 Termination Claim.*[7]**

■ 4. In a § 1981 disparate treatment case, like a Title VII disparate treat-

---

**7.** The Court does not reach the defendants'  argument that Alternative Behavioral Ser-

ment case, a plaintiff must prove intentional discrimination. *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998) (§ 1981 and Title VII have the same proof requirements and use the same analytical framework), *reh'g denied,* 172 F.3d 884 (1999) (en banc); *see St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747 & 2754, 125 L.Ed.2d 407 (1993); *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1266 & 1267 (11th Cir.1999).[8] A plaintiff "may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence." *Standard,* 161 F.3d at 1330. Crews seeks to show discrimination using circumstantial evidence, there being no direct or statistical evidence of intentional race discrimination by the defendants. (*See* Doc. 16, Crews depo., at 133) (neither Carpenter nor anyone employed by the defendants made any racial comments to him); Doc. 19, Plaintiff's Brief in Support of his Response to Defendants' Motion for Summary Judgment, at 4–6 (plaintiff confines discussion of his claim solely within the context of the shifting burden framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

When a plaintiff attempts to prove intentional discrimination in violation of Title VII using circumstantial evidence, we apply the now familiar shifting burden framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination.... If he meets that burden, then an inference arises that the challenged action was motivated by a discriminatory intent.... The burden then shifts to the employer to "articulate" a legitimate, non-discriminatory reason for its action.... If the employer successfully articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is really pretext for unlawful discrimination.

*Schoenfeld, supra,* 168 F.3d at 1267 (citations omitted).

■■■ 5. In order to make out a prima facie case of discriminatory termination on account of race, plaintiff must show: (1) he is a member of a protected class; (2) he suffered an adverse job action; (3) his employer treated similarly-situated em-

---

vices, Inc. and WAYS are due to be dismissed from this action because the evidence does not clearly and indisputably establish that neither of these entities was Crews' employer. The administrator of WAYS, Joe Carpenter, first informed plaintiff that he was being terminated and this certainly constitutes some indicia that Crews was employed by WAYS as well as by First Corrections Corporation. Moreover, it appears clear from the evidence provided to this Court that Alternative Behavioral Services, Inc. promulgated and drafted the very policy under which plaintiff was terminated. Accordingly, the Court will not find as a matter of law that Alternative Behavioral Services, Inc. is due to be dismissed.

**8.** The defendants are correct that plaintiff's claim is somewhat atypical inasmuch as it is a reverse-discrimination raced-based disparate

treatment claim but they have just as correctly addressed the merits of this claim given the present legal landscape. *See Johnson v. Transportation Agency, Santa Clara County,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (court addressed male plaintiff's Title VII action for sex discrimination based on the county's decision to promote a female applicant to the position of road dispatcher); *Fredette v. BVP Management Associates,* 112 F.3d 1503, 1510 (11th Cir.1997) ("[W]e hold today that when a homosexual male supervisor solicits sexual favors from a male subordinate and conditions work benefits or detriment on receiving such favors, the male subordinate can state a viable Title VII claim for *gender* discrimination."), *cert. denied,* 523 U.S. 1003, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998).

ployees outside his classification more favorably; and (4) he was qualified to do the job. *See Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (citations omitted). The defendants contend that plaintiff has not satisfied the third or fourth requirements of his prima facie burden. This Court will not address the defendants' fourth requirement attack at length [9] particularly since it is clear that Crews' evidence does not establish that the defendants treated similarly situated employees outside his classification more favorably. Accordingly, his prima facie case, and therefore his § 1981 race discrimination claim, fails.

> 6. To make a comparison of the plaintiff's treatment to that of [ ]minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.

*Holifield, supra,* 115 F.3d at 1562 (internal citations and emphasis omitted). Plaintiff's deposition testimony simply does not demonstrate that he was treated differently than similarly situated minority employees. The insurmountable hurdle for plaintiff is that he cannot show that he was similarly situated to any minority employee who was not terminated. In cannot be gainsaid that the clear policy for employees of WAYS is that anyone absent for three consecutively scheduled work days without proper notification is considered to have voluntarily quit and is immediately terminable nor can it be gainsaid that the defendants' Attendance and Punctuality Policy delineates different disciplinary action for those employees who are chronically absent or tardy even with proper notification. Plaintiff does not and cannot make any argument that he did not violate the defendants' policy regarding the three consecutive absences rule [10] nor has he presented any evidence that any black employee of WAYS was ever absent from work on three consecutive workdays and was not terminated. In fact, the only credible evidence in this regard is that two black employees of WAYS have been terminated under this particular section of the defendants' Attendance and Punctuality Policy, one prior to plaintiff's May 5, 1998 termination date and one after his termination date. The three black employees of WAYS to which Crews compares himself, Robert Jackson, Mance Howard and Jessie Wiggins, are not apt comparators because none of these employees was ever absent without proper notification for three consecutive workdays and disciplined differently. Jessie Wiggins' problem, a problem for which he was disciplined, was tardiness, not absenteeism, and inasmuch as plaintiff has not shown that Wiggins was terminable under the defendants' Attendance and Punctuali-

9. The Court would simply note parenthetically that the defendants have cited no cases establishing that evidence acquired post-termination can serve as proof that an individual is not qualified for a job that he/she held up to the date of termination.

10. Clearly, on May 1, 1998, plaintiff did not report that he would be absent four hours prior to his shift, as required by company policy. Moreover, on his next two scheduled

workdays, May 3 & 4, 1998, not only did plaintiff not personally report his absences, as required by policy, but, in addition, the individuals reporting those absences either failed to report them four hours prior to the start of the shift or failed to report the specific reason for the absence, as required by policy. Accordingly, the Court does not hesitate in finding that plaintiff did not give proper notice of any of these absences to WAYS.

ty Policy due to his tardiness he is not a valid comparator. Mance Howard, who walked off the job and was terminated by the defendants, is clearly not an apt comparator. Finally, Robert Jackson is not a valid comparator even though he engaged in conduct similar to plaintiff, absenteeism, because Jackson's absences never came without proper notification on three consecutive workdays and Jackson eventually resigned rather than be terminated due to his chronic absenteeism. In short, Crews cannot establish this requirement of his prima facie case because he cannot show that any WAYS employee who was absent from work without proper notification for three consecutive workdays was not terminated in accordance with Paragraph II.N. of the defendants' Attendance and Punctuality Policy.

■ 7. Alternatively, the defendants are due to be granted summary judgment on plaintiff's § 1981 claim because plaintiff cannot rebut the defendants' legitimate, nondiscriminatory reason for his termination. "The reason offered by an employer for an action " 'does not have to be a reason that the judge or jurors would act on or approve.' " ... Instead, all that matters is that the employer advance an explanation for its action that is not discriminatory in nature." *Schoenfeld, supra,* 168 F.3d at 1269 (citations omitted).

8. It is clear to the Court that the sole reason Crews was terminated was because of the existence of Paragraph II.N. of the defendants' Attendance and Punctuality Policy which states that "[e]mployees who are absent for three (3) consecutively scheduled work days without giving proper notice to the Organization will be considered as having voluntarily quit. The Organization will formally note the termination and advise the employee of the action by certified mail." Because of the existence of Paragraph II.N. the adminis-

trator of the WAYS facility, Joe Carpenter, an African–American, informed plaintiff that he was being terminated.

9. In an effort to establish that the reason offered by the defendants for plaintiff's termination is a mere pretext for unlawful race discrimination, plaintiff contends that he was the only white detention officer employed at the facility, the administrator of the facility is black and that Robert Jackson was a black employee who failed to report his absences and was disciplined and suspended, before eventually resigning, rather than being terminated on his first violation of company policy.[11]

Once a defendant articulates a legitimate, non-discriminatory reason for its action, the initial inference of discrimination "drops" from the case.... The burden then shifts back to the plaintiff to show that the proffered reason was pretext for intentional discrimination and that the defendant intentionally discriminated against him.... A plaintiff may show pretext and survive summary judgment by "presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons."

*Schoenfeld,* 168 F.3d at 1269 (citations omitted). Neither the fact that Crews is white and the administrator of the facility is black nor the fact that Robert Jackson, a black employee, was progressively disciplined for his absenteeism, without more, establishes a genuine issue of material fact as to the truth or falsity of the reason given for the termination of the plaintiff. If a mere difference in racial makeup could establish pretext on its face, summary judgment would never be appropriate in a race discrimination case. Moreover, Crews simply cannot create a genuine issue of material fact on the issue of pretext by comparing himself to Jackson since Jackson did not violate the same portion of

**11.** Plaintiff nowhere argues that he gave     proper notification of his absences.

the defendants' Attendance and Punctuality Policy that plaintiff violated. There is no evidence whatsoever that Jackson violated Paragraph II.N., like Crews, and therefore, when Jackson gave improper notification of his absences, necessarily the facility had to employ the progressive discipline procedures set forth in their Attendance and Punctuality Policy rather than being able to immediately terminate Jackson under Paragraph II.N. Crews has no evidence that anyone who was chronically absent without proper notification, like Jackson (a day here, a day there), was not treated just like Jackson or conversely that anyone who has violated Paragraph II.N., regardless of race, has not been terminated.[12] That plaintiff had the misfortune of violating Paragraph II.N. of the defendants' Attendance and Punctuality Policy rather than another paragraph of that policy simply cannot be regarded as pretext for unlawful race discrimination. Accordingly, the Court finds that the plaintiff has failed to offer any material evidence sufficient to demonstrate pretext in the defendants' legitimate, non-discriminatory reason for his termination.

10. Because plaintiff cannot establish a prima facie case of race discrimination, or rebut defendant's legitimate, nondiscriminatory reason for his termination, his claim must fail and this Court need not consider the defendants' *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) defense or after-acquired evidence doctrine argument.

### CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is due to be **GRANTED** and therefore, plaintiff's complaint is due to be **DISMISSED WITH PREJUDICE.**

---

12. As alluded to earlier, the only credible evidence of record is that the only other WAYS employees who have violated Paragraph II.N., both black employees, have had their employment terminated.